Filed 7/16/13  P. v. Smith CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B235380 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA094070) |
| v. | |
| MICAH ANTHONY SMITH et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County. Bruce F. Marrs, Judge.  Affirmed; remanded with directions.

Karyn H. Bucur, under appointment by the Court of Appeal, for Defendant and Appellant Micah Anthony Smith.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant Clyde Bailey.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Zee Rodriguez and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellants Micah Anthony Smith (Smith) and Clyde Bailey (Bailey) appeal from their judgments of conviction. Appellants raise a number of issues on appeal relating to their convictions and sentences. We affirm the convictions, but find certain sentencing errors.

## PROCEDURAL BACKGROUND

The Los Angeles County District Attorney filed an information charging appellants and their codefendants, Marquette Jarrett (Jarrett) and Shaundon Lamark Gray (Gray) (who are not parties to this appeal), with the following crimes: conspiracy to commit residential burglary (Pen. Code, § 182, subd. (a)(1) (count 1);[1] attempted first degree burglary of the residence of Toan Duc Vo (Vo) (§§ 664, 459) (count 2); attempted first degree burglary of the residence of K. Tran (Tran) (§§ 664, 459) (count 3); and unlawful driving or taking of a vehicle, i.e., a Chevy Tahoe belonging to Sara Bringas (Bringas) (Veh. Code, § 10851, subd. (a)) (count 4). Smith was also charged with receiving stolen property, the Chevy Tahoe (§ 496d, subd. (a) (count 5). As to the attempted first degree burglaries in counts 2 and 3, it was alleged that a person was present in the residence during the crimes. As to all counts, it was alleged that the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(B)). The information also alleged that Smith had two prior "strike" convictions (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)), two prior serious felony convictions (§ 667, subd. (a)(1)), and had served a prior prison term (§ 667.5, subd. (b)). It also alleged that Bailey had a prior "strike" conviction (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)) and a prior serious felony conviction (§ 667, subd. (a)(1)).

During jury selection, codefendants Jarrett and Gray entered no contest pleas to one count of attempted first degree burglary. Appellants were then tried together before separate juries. During trial, count 4 was dismissed as to Bailey.

The jury found Smith guilty on counts 1, 2, 4, and 5. The jury was unable to reach a verdict on count 3 and the trial court declared a mistrial as to that count. As to count 2,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

the jury found true the allegation that a person was present in the residence during the crimes. As to all counts, the jury found true the gang allegation.

The jury found Bailey guilty on counts 1 through 3. As to counts 2 and 3, the jury found true the allegation that a person was present in the residence during the crimes. As to all counts, the jury found true the gang allegation.

Following a court trial on the prior conviction allegations as to Smith, the trial court found the allegations to be true. Smith was sentenced to a total of 41 years to life in state prison. The sentence consisted of 25 years to life on count 1 under the Three Strikes law, plus five years for the gang enhancement, plus 10 years for the two prior serious felony enhancements, plus one year for the prior prison term enhancement. The sentences on the remaining counts were stayed.

Bailey admitted the prior "strike" and prior serious felony allegations alleged against him. The trial court sentenced him to seven years in state prison. The sentence consisted of the low term of one year on count 2, doubled to two years because of the prior strike, plus five years for the prior serious felony enhancement. The trial court struck the gang enhancement and stayed the sentences on the remaining counts.

## FACTS

### Prosecution Case

#### Evidence presented to both juries

Bringas owned a red Chevy Tahoe. On the morning of December 15, 2010, she returned home from shopping to discover that her Tahoe was missing, her bedroom had been ransacked, and one of her house doors had been pried open. Missing from the house were jewelry, coins and the keys to her Tahoe.

On the morning of December 17, 2010, Ronald Chenier (Chenier) was home when the doorbell rang. When he went to answer the door, he saw a young African-American male whom he did not recognize. He did not open the door, and watched the man retrieve something from an SUV parked in front of the house. Chenier went to his kitchen and saw the man trying to "jimmy" open a window. Chenier went outside. The man punched him in the jaw and another man struck him in the back of the head,

3

knocking him down. When Chenier looked up, he saw the two men run down his driveway and get into an SUV. He reported the partial license plate number of "6HF923" to the police. The license plate number of Bringas's red Tahoe was 6HHG923.

Chenier was unable to identify anyone from a photographic six pack shown to him by the police. In viewing different live lineups, he identified Smith. At trial, he identified Bailey and testified that he believed Bailey was the person he had picked in the live lineup instead of Smith. The parties stipulated that Bailey could not have been at Chenier's house on the day of the incident because he was in the custody of the juvenile detention department at that time.

On December 29, 2010, Vo was at his house on the corner of Muscatel Avenue and Hovey Street in Rosemead when someone rang the bell at the gate of the fence that surrounded his property. Vo had a surveillance system with eight cameras. He looked at the monitor and saw an African-American male at the gate. He watched the man walk down his driveway, then walk back to the gate, climb over the gate, walk to his front door and shake the handle before leaving the property. He saw the man get into a vehicle that turned right onto Hovey Street. A copy of the surveillance footage was shown to the jury, and Vo identified Smith at trial. The video footage showed that at the time Smith was ringing the doorbell, he was looking at a piece of paper in his hand and talking on a cell phone.

The same day, 15-year-old Tran was at his house on Hovey Street near Muscatel Avenue when someone knocked on the front door. Tran opened the door and saw an African-American male who asked for directions to the freeway. Tran said he was not old enough to drive and needed to go ask his father. When Tran returned, the man was gone and Tran saw a red SUV driving away. On the day of the incident, Tran told the police that he heard three loud bangs on the front door and then heard someone pulling forcefully on the door. He also told the police that the person kept looking over his shoulder and turning around in a suspicious manner while talking to Tran. At trial, Tran identified Bailey as the person at his front door.

Also on December 29, 2010, Los Angeles County Deputy Sheriff Juan Rivera responded to a call regarding suspicious males inside a red SUV near the area of Muscatel and Hovey. He saw the vehicle on Muscatel and initiated a traffic stop. Smith was the driver, Bailey was the front passenger, and codefendants Jarrett and Gray were in the backseats. After learning the SUV was Bringas's stolen Tahoe, Deputy Rivera and other responding officers detained the men and searched the car. Seven cell phones and a screwdriver about 14 to 16 inches long were found. The police then transported Tran to the location of the SUV for a field show up. Tran identified Bailey as the person who was at his front door, and also identified the SUV as the one he had seen at his house.

**Gang Evidence**

Los Angeles Police Department Officer Brian Zavala testified as a gang expert. He monitored the Rollin 30's Harlem Crips gang (Rollin 30's gang), which had about 730 active members. The gang's primary activities included burglary, robbery, murder, rape, possession of concealed firearms, and driving stolen vehicles.

In Officer Zavala's opinion, Smith, Jarrett and Gray were all members of the Rollin 30's gang. Smith, Jarrett and Gray each had tattoos reflecting their gang membership. Smith also had a tattoo that said "Hot Heads," which was a clique of the Rollin 30's gang "tasked" with committing residential burglaries. Numerous field identification cards reflected Smith's membership in the gang and his gang moniker as "Tiny Crazy D." Jarrett had admitted his membership in the gang. Officer Zavala also testified that Bailey was a member of the 8 Trey Gangster Crips. Bailey had also admitted his membership in the 8 Trey Gangster Crips, and his gang moniker was "Trey Boy." It was not unusual for members of the two gangs (both Crips gangs) to be in each other's company.

Officer Zavala testified about the manner in which Rollin 30's gang members committed residential burglaries. He testified that they generally committed burglaries in areas outside of their gang's territory using cars that were stolen or rented. They typically used a crew of three to four gang members who communicated by cell phone. One person was the driver and one person was the look out. Someone would knock on a

5

door to see if anyone was home. If someone answered the door, the gang member would have an excuse for knocking, such as asking for directions. They generally broke into a house in the backyard where they could not be seen. The most common burglary tool used was a large screwdriver.

Officer Zavala testified that in his opinion the crimes committed on December 29, 2010, were committed for the benefit of, in association with, or at the direction of the Rollin 30's gang. He explained that the commission of residential burglaries makes the gang more powerful, creates fear of the gang in the community, brings money into the gang, and helps the recruitment of younger members.

**Additional Evidence Presented to Smith's Jury**

On April 30, 2005, Kelly Barlow (Barlow) was asleep in her home in Lancaster when the doorbell rang at about 4:00 a.m. She went to a front window and saw an African-American male reaching toward the window. Barlow jumped back and called 911. The man banged on the window, repeatedly rang the doorbell, and pulled on the metal security gate at the front door. Barlow went into her garage and got into her car while still talking to the 911 operator. When everything became quiet, she went back inside her house. She heard the handle of her front door rattling, which meant the person had gotten past the metal security gate. Barlow went back to the garage, got into her car, and backed into the driveway. She saw the man running toward her car and reaching for the passenger door. Barlow repeatedly honked the car horn and the man ran away. The police then arrived.

Barlow examined the front door and metal security gate. The mesh on the security gate had been pried away from the frame and a bolt that secured the frame to the house had been removed. There were scratches and dents on metal plates on the door jamb and on the dead bolt on the front door. Thumbprints lifted from the metal security gate and from the door latch on the front door matched Smith's thumbprint.

On May 31, 2005, around 3:30 p.m., Pat Beck returned to his house in Los Angeles to find that two bedrooms had been ransacked. He went outside and called the police. He walked through his house with the police and discovered that personal

6

property and jewelry were missing. A window in the back guest room had been broken and pried open. A fingerprint lifted from the outside of the window frame matched Smith's fingerprint.

### Additional Evidence Presented to Bailey's Jury

After Bailey was arrested, he was taken to the Temple City Police Station where he waived his *Miranda*[2] rights and spoke to the police. Bailey said that he had spent the night at codefendant Gray's house. The next morning, Smith and codefendant Jarrett picked them up in a red Chevy Tahoe. Bailey did not know the car was stolen. The men decided to look for houses to burglarize, especially houses owned by Asians.[3] When they reached the corner of Muscatel Avenue and Hovey Street, someone said, "That's the house." Smith pulled over and got out of the SUV. He walked to a house on the corner and stood at the front gate. He then walked down the street, went back to the front gate and jumped over it. A minute or two later he came back to the car and said the house was secured.

The men then drove down Hovey to a dead end. Bailey got out of the car and went to a home where he asked an Asian male teenager for directions because they were lost. He got back into the car and they drove away until they were stopped by the police. Bailey admitted that he was a member of the 8 Trey Gangster Crips.

### Defense Case

Smith's wife, China Perrigen testified that Smith left their house around 9:30 or 10:00 a.m. on December 29, 2010, and got into a red truck with codefendant Marquette, who was driving.

Shaniece Phipps met codefendant Jarrett at a Christmas party in 2010. She made plans to meet him on December 27 or 28, 2010, between 8:00 p.m. and 9:00 p.m. at a

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[3]     There was testimony that gang members believed Asians kept lots of jewelry, money and firearms in their houses. The gang members would look for Asian houses by trying to spot shoes on the porch.

7

park near Muscatel in Rosemead, which was near her aunt's house.  She went to the park but no one was there.

Neither Smith nor Bailey testified, and Smith did not present any evidence in his defense.

**Prosecution's Rebuttal Case**

Shaniece Phipps told Smith's investigator that she was going to meet Jarrett at a park near Rosemead and Valley Boulevards.  She never said the park was near Muscatel.

## DISCUSSION

## I.  The Trial Court Properly Denied Smith's *Wheeler/Batson*[4] Motions

Smith contends the trial court erred in denying his *Wheeler/Batson* motions as to two African-American potential jurors, Juror No. 12 and Juror No. 17.

### A.  *Relevant Proceedings*

Smith and Bailey are African-American.  During voir dire, there were four African-American potential jurors.  The prosecutor exercised a peremptory challenge against one of these jurors, Juror No. 7, who was approximately 30 years old and had a prominent tattoo.  Smith's attorney objected and brought a *Wheeler/Batson* motion.  The trial court found a prima facie case of racial discrimination and asked the prosecutor to state his reasons for his peremptory challenge.  The prosecutor explained that tattoos were going to be an important part of the case and he was concerned that Juror No. 7 might identify with appellants in light of the juror's age and tattoo.  The trial court found that the prosecutor had offered valid, race-neutral reasons for excusing Juror No. 7 and that they were the actual reasons for the challenge.  The court denied Smith's *Wheeler/Batson* motion.  The remaining three African-American jurors, Juror Nos. 12, 17 and 18, were called into the jury box and questioned.

Juror No. 12 was a woman in her forties.  Her husband had been a deputy sheriff who left the department because he was convicted of fraud.  The trial court asked her whether that would affect her ability to be fair to both sides in the case.  She replied, "No.

---

[4]     *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).

8

But I do feel very uncomfortable with the situation." The trial court then asked her whether she could put the matter aside and decide the case based on the evidence. She replied, "Yeah. I guess so. Yes."

During questioning by the defense, Juror No. 12 said that she was a retired middle school teacher who taught art. She had students who were gang members with tattoos, and she encouraged some of her students to express their creativity in a manner other than graffiti.

When the prosecutor questioned Juror No. 12, the following exchange occurred:

"[THE PROSECUTOR]: You said you were uncomfortable, something uncomfortable about this, and I don't understand. [¶] What's uncomfortable?

"[JUROR NO. 12]: Just the process. Just being here in this situation just makes me nervous. I lose sleep. It's uncomfortable.

"[THE PROSECUTOR]: Does what happened to your husband have something to do with that discomfort?

"[JUROR NO. 12]: Oh, yeah, definitely. Definitely.

"[THE PROSECUTOR]: Hmmm. Okay. [¶] Was your husband charged with a crime?

"[JUROR NO. 12]: Yes.

"[THE PROSECUTOR]: Did he serve time?

"[JUROR NO. 12]: Yes.

"[THE PROSECUTOR]: Obviously that's very traumatic. [¶] Do you think he was treated fairly?

"[JUROR NO. 12]: At times. There were situations that happened that I thought it wasn't fair. Once he was sent away. I think maybe here. And the justice system here, during the court system, he probably was treated fairly. But once he was sent away, not necessarily.

"[THE PROSECUTOR]: Okay. So what do you think? [¶] I notice[d] that when you answered the court's question about can you be fair, you kind of hesitated. [¶] I mean, am I right that you kind of hesitated when you answered that question?

9

"[JUROR NO. 12]:  In terms of just feeling uncomfortable, you know, so that's the whole thing.  I can see both sides of the situation.  I can see the defendant's side.  I can see the prosecution side.  [¶]  Do I think that the police will be necessarily truthful. [¶] Maybe not.  [¶]  Do I think that the defendant might necessarily be truthful?  [¶] Maybe not.  So there's both sides of it."

Juror No. 17 was a man in his forties.  He had a cousin who was a Mississippi state trooper, but he never communicated with him.  He also had two friends who worked for the Los Angeles County Sheriff's Department whom he saw every weekend.  He also had friends who were gang members and former gang members.  He was a telephone technician who sometimes worked in gang areas but did not feel threatened in those areas.

When defense counsel asked Juror No. 17 if he could be fair to the prosecution, he replied, "Yeah.  I've been arrested before, or falsely arrested."  He then explained that the manager of a store thought he was with a group of people passing bad checks and he sat in the back of a police car for 45 minutes.  He also stated that his brother was falsely arrested and jailed for three weeks for a burglary that he did not commit.  Juror No. 17 explained, "It was a witness problem.  Somebody said she saw him, but it wasn't him." Defense counsel asked Juror No. 17 if those experiences made him biased.  He replied, "No. I don't blame them.  There's bad apples in everything."  Defense counsel asked him if he felt law enforcement "was doing their job."  He replied:  "Yeah.  Some.  Yeah.  To a point.  Like I say, it wasn't their fault.  It was a witness.  Mine was the store manager.  He said I was with the people.  I didn't know the people, they just—I mean, I would have liked an explanation.  Being handcuffed and put in the back of a squad car for 45 minutes and not being told why was kind of rough.  But once they explained it, it was like, oh, okay."

After the jurors were questioned, the trial court conducted a side bar and asked the prosecutor if he planned to exercise his peremptory challenges against Juror Nos. 12, 17 and 18, a woman in her twenties.  The prosecutor responded that he was going to challenge Juror Nos. 12 and 17, but was not sure about Juror No. 18.  The trial court then

10

commented as to Juror No. 12 that "you've got the [married] husband out of law enforcement," and "She's hesitated. She's uncomfortable. She's got gang issues, as well, in art. She said her husband was treated fairly at times. [¶] . . . those would all appear to be race neutral." As to Juror No. 17, the trial court commented, "The gentlemen's brother's falsely arrested. He was falsely arrested, on the one hand; on the other hand, he hangs with a couple of L.A. officer types on weekends watching ball games. He worked in a gang area. All of these would be justifications that would certainly justify a peremptory challenge, if it wasn't for the mere fact that he's black." Smith's attorney stated that he did not believe the reasons for excusing the African-American jurors were race neutral and compared them to a Caucasian juror, Juror No. 16. The trial court stated, "I think peremptory as to 12 would certainly lie based on her background. [¶] I think 17 and 16 would both be race neutral based on their backgrounds." The prosecutor exercised peremptory challenges against Juror Nos. 12 and 17. The defense renewed its *Wheeler/Batson* motions, which the trial court denied.[5]

### B. Relevant Law

Both the state and federal Constitutions prohibit the use of peremptory challenges to excuse prospective jurors based on race. (*People v. Jones* (2011) 51 Cal.4th 346, 360.) A defendant who suspects that a juror has been challenged based on race may bring a *Wheeler/Batson* motion, which requires three steps. (*People v. Lomax* (2010) 49 Cal.4th 530, 569.) First, the defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge based on race, "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." (*Batson, supra*, 476 U.S. at pp. 93–94.) Second, if such a showing is made, the burden shifts to the prosecutor to demonstrate that the challenge was made for a race-neutral reason. (*Id*. at p. 94.) Third, if the prosecutor offers a race-neutral explanation, the trial court must decide whether the defendant has proven purposeful discrimination. (*Johnson v. California* (2005) 545 U.S. 162, 168.) At the third step, """"the issue comes down to

---

[5] It appears the prosecutor did not excuse Juror No. 18.

whether the trial court finds the prosecutor's race-neutral explanations to be credible. . . .""" (*People v. Lomax, supra*, at pp. 570–571.) "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.]'" (*Id.* at p. 569.)

### C. No Error by Trial Court

Smith argues the trial court "procedurally erred" in denying his *Wheeler/Batson* motions because it failed to ask the prosecutor to explain his reasons for challenging two of the three remaining African-American jurors. According to Smith, the trial court made an implied finding that there was a prima facie case of group bias and then improperly supplied its own race-neutral reasons instead of requiring the prosecutor to do so. We disagree.

First, the record does not support the conclusion that the trial court made an implied finding that Smith demonstrated a prima facie case of group bias. The trial court never stated that it found a prima facie case of bias. Presumably, if the trial court had made such a finding, it would have said so, just as it did when it ruled earlier on the *Wheeler/Batson* motion as to Juror No. 7: "I have to find a prima facie case. On the totality of the relevant facts that I'm aware of, certainly give rise to an inference of discriminatory purpose." The trial court also never asked the prosecutor to explain his reasons for challenging Juror Nos. 12 and 17, as it did previously with Juror No. 7: "So the burden now shifts to [the prosecutor] on behalf of the People, who must give race-neutral justifications or inferences of justifications . . . . [¶] . . . And of course I must be satisfied that the explanation is genuine." From these comments, it appears that the trial court correctly understood the procedural requirements.

Second, the law does not support the conclusion that the trial court made an implied finding of a prima facie case of group bias. Smith cites no law to support the proposition that the mere discussion of a juror's characteristics between a judge and attorneys means the trial court has found a prima facie case of group bias. "A defendant may make out a prima facie case of group bias in jury selection by showing that 'the totality of the relevant facts gives rise to an inference of discriminatory purpose.'"

12

(*People v. Avila* (2006) 38 Cal.4th 491, 548.) The inference can easily be made that the trial court's discussion of the voir dire responses of Juror Nos. 12 and 17 shows that the court was considering the totality of the relevant facts in concluding that there was no prima facie case of group bias. Indeed, even if the trial court had inquired about the prosecutor's justifications for his peremptory challenges, it would not necessarily mean the trial court had found a prima facie case of group bias. (*People v. Taylor* (2010) 48 Cal.4th 574, 616 ["We have found it proper for trial courts to request and consider a prosecutor's stated reasons for excusing a prospective juror even when they find no prima facie case of discrimination; indeed, we have encouraged this practice"].)

To the extent Smith is arguing that the trial court erred in not finding a prima facie case of group bias, we reject this argument. When a trial court denies a *Wheeler/Batson* motion because it finds no prima facie case of group bias, "'the reviewing court considers the entire record of voir dire. [Citation.] If the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question, we affirm.'" (*People v. Panah* (2005) 35 Cal.4th 395, 439.) Here, there were race neutral grounds upon which the prosecutor might reasonably have challenged Juror Nos. 12 and 17.

As to Juror No. 12, her husband had been a deputy sheriff who was convicted of fraud. When the trial court asked if she could be fair to both sides, she replied that she was "very uncomfortable with the situation." The prosecutor commented that she hesitated when the trial court asked her if she could be fair. When the prosecutor followed up, she said that she was uncomfortable with "the process. Just being here in this situation just makes me nervous. I lose sleep. It's uncomfortable." She said that her discomfort was related to her husband's situation. In light of her husband's criminal conviction, her hesitation to state she could be fair, and her discomfort with the trial process, the prosecutor could have been legitimately concerned that Juror No. 12 would not be a good juror for the prosecution. (See *People v. Gray* (2005) 37 Cal.4th 168, 192 [no prima facie case shown where prosecutor challenged prospective juror who indicated that someone close to her had been arrested and sent to jail].)

13

As for Juror No. 17, both he and his brother had been falsely arrested. Juror No. 17 said that he spent 45 minutes handcuffed in a police car for a crime he did not commit, and his brother spent three weeks in jail for a crime his brother did not commit. The prosecutor could have reasonably believed that a juror who had been falsely arrested and whose brother had been falsely arrested might be sympathetic to the defense. (See *People v. Lenix* (2008) 44 Cal.4th 602, 628 ["'We have repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement'"].) Juror No. 17 also had friends who were gang members and former gang members. This also could have caused the prosecutor to believe Juror No. 17 would be sympathetic to the defense.

Appellant also appears to argue that the trial court erred in denying his motion because a comparative juror analysis between Juror Nos. 12 and 17 and Juror No. 16, who was not dismissed, revealed group bias. Appellant, however, acknowledges that a comparative juror analysis comes into play in the third step of a *Wheeler/Batson* motion. The trial court never reached the third step. Neither do we.

## II. No Merit to Smith's Claim That Trial Court Erred in Denying His Motion to Dismiss a Juror for Cause

Smith contends the trial court erred in denying his motion to excuse for cause a juror who was originally known as Juror No. 12. We find no merit to this claim. To prevail on a claim challenging a trial court's denial of a challenge for cause, a defendant must show that the court's denial of the challenge for cause "'"affected his right to a fair and impartial jury."'" (*People v. Clark* (2011) 52 Cal.4th 856, 902.) If the prospective juror does not actually sit on the jury, then the trial court's ruling denying the challenge for cause could not have affected the defendant's right to a fair and impartial jury. (*Ibid*.) Here, codefendant Gray's attorney excused Juror No. 12. At the time, he was exercising peremptory challenges for all defendants jointly. Because Juror No. 12 did not sit on the jury, Smith's right to a fair and impartial jury was not violated.

14

**III. The Trial Court Properly Dismissed Juror No. 4 During Deliberations**

Smith contends the trial court violated his constitutional rights to a fair trial and due process by dismissing Juror No. 4 during deliberations without good cause.

Section 1089 permits the trial court to remove a juror if upon "good cause shown to the court [the juror] is found to be unable to perform his or her duty." Removal of a juror under section 1089 is committed to the discretion of the trial court, and we review whether the grounds for such removal appear in the record as a "demonstrable reality." (*People v. Thompson* (2010) 49 Cal.4th 79, 137.) "The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052–1053.)

"A juror who refuses to follow the court's instructions is 'unable to perform his duty' within the meaning of . . . section 1089." (*People v. Williams* (2001) 25 Cal.4th 441, 448; *People v. Alexander* (2010) 49 Cal.4th 846, 926 [a deliberating juror's refusal to follow the law set forth in the instructions constitutes a failure to perform the juror's duties and is a ground for discharge]; *People v. Ledesma* (2006) 39 Cal.4th 641, 738 ["In appropriate circumstances a trial judge may conclude, based on a juror's willful failure to follow an instruction, that the juror will not follow other instructions and is therefore unable to perform his or her duty as a juror"].)

Here, the trial court dismissed Juror No. 4 for discussing punishment during deliberations. The jury was instructed with CALJIC No. 17.42: "In your deliberations do not discuss or consider the subject of penalty or punishment. That subject must not in any way affect your verdict."

During deliberations, the trial court received a note from Juror No. 9 stating that "one of the jurors is not fair and impartial" because the juror had said, "We are sending someone to jail for 5-10 years and they will [lose] their right to vote." The note further stated, "Continues to go over sentence time." The trial court questioned Juror No. 9, who confirmed that Juror No. 4 made the comments about punishment, that Juror No. 4 made such comments more than once, and that Juror No. 4 appeared to be basing his verdicts

15

on that consideration. The court then questioned Juror No. 4, who admitted making the comments during deliberations despite hearing the trial court's instruction not to consider the subject of penalty or punishment.

The trial court's determination that Juror No. 4 committed misconduct by willfully ignoring its instructions is therefore supported to a demonstrable reality. (See *People v. Ledesma, supra*, 39 Cal.4th at pp. 742–743 [trial court properly discharged juror who violated instruction not to discuss case outside of deliberations].) Thus, there was no violation of Smith's constitutional or statutory rights. (*People v. Fuiava* (2012) 53 Cal.4th 622, 716.)

While Smith concedes that Juror No. 4's comments about punishment during deliberations were contrary to the court's instructions and constituted misconduct, he nevertheless argues that Juror No. 4 should not have been dismissed because Juror No. 4 indicated during questioning by defense counsel that he had been admonished by the other jurors and had "accepted" their admonitions. But the trial court found Juror No. 4's statements minimizing his misconduct to be lacking in credibility. The trial court stated: "Despite good leading on your part, it's pretty clear that the gentleman's a liar." The issue of credibility was for the trial court to resolve. As our Supreme Court explained in *People v. Lomax, supra*, 49 Cal.4th at page 590: "We have observed that trial courts are frequently confronted with conflicting evidence on the question whether a deliberating juror has exhibited a disqualifying bias. [Citation.] 'Often, the identified juror will deny it and other jurors will testify to examples of how he or she has revealed it.' [Citation.] In such circumstances, the trial court must weigh the credibility of those testifying and draw upon its own observations of the jurors throughout the proceedings. We defer to factual determinations based on these assessments." Even though Juror No. 4 denied that his verdict would be based on the issue of penalty, Juror No. 9 said that it did appear Juror No. 4 was basing his verdict on the issue of penalty.

Smith also argues that the trial court erred in dismissing Juror No. 4 without first conducting an appropriate hearing that would have involved questioning all of the jurors. Smith's reliance on *People v. Barnwell, supra*, 41 Cal.4th 1038 is misplaced. In

16

*Barnwell*, after receiving notes from the jury about a "problem juror," the trial court conducted a hearing and took testimony from all 12 jurors. (*Id*. at pp. 1048–1049.) But the *Barnwell* court never stated that questioning all jurors was required in every case. Indeed, here, Juror No. 4 admitted that he was not following the court's instructions. The trial court reasonably could have determined that further inquiry was unnecessary. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1159 ["The trial court retains discretion about what procedures to employ, including conducting a hearing or detailed inquiry, when determining whether to discharge a juror"].)

Moreover, even if the trial court erred in dismissing Juror No. 4 and replacing him with an alternate juror, the error was harmless. (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1486.)[6] Smith does not explain how the substitution of Juror No. 4 with an alternate juror prejudiced him. There is nothing in the record to indicate that Juror No. 4 believed Smith was not guilty. Additionally, even after Juror No. 4 was dismissed, the jury still deadlocked on one of the charges against Smith. Thus, Smith cannot show how he was harmed by the dismissal of Juror No. 4.

## IV. Gang Enhancement

The jury found true the gang allegations attached to all counts. Smith contends there was insufficient evidence to support the true findings because there was no evidence that the offenses were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members.

---

[6] As the court stated in *People v. Thomas, supra*, 218 Cal.App.3d at page 1486: "[A] defendant's right to a fair and impartial jury does not entitle him to a jury composed of any particular individuals. [Citations.] '[W]here an alternate juror, approved by defendant in voir dire, is allowed to deliberate on the jury panel, the defendant bears a heavy burden to demonstrate that he was somehow harmed thereby.' [Citation.] This is so because alternate jurors are selected at the same time, are subject to the same qualifications and take the same oath as regular jurors. They hear the same evidence and are bound by the same rules and instructions as the regular jurors, and until the verdict is rendered they are at all times available and qualified to participate as regular jurors."

17

### A. *Standard of Review*

When reviewing a challenge to the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) This standard applies whether direct or circumstantial evidence is involved. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) The standard also applies when determining whether the evidence is sufficient to sustain a jury finding on a gang enhancement. (*People v. Mendez* (2010) 188 Cal.App.4th 47, 56.) "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.) Reversal is not warranted unless it appears that "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### B. *Substantial Evidence Supports the Gang Enhancements*

Section 186.22, subdivision (b)(1)(A), provides that "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members," shall receive additional punishment. The jury was so instructed with CALJIC No. 17.24.2. The enhancement therefore has two prongs—the benefit prong and the intent prong. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.)

Smith focuses on the intent prong. He points out that while the gang expert opined on the first prong, the expert was never asked his opinion on the second prong, i.e., whether the offenses were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. But appellant points to no authority indicating that the absence of such an expert opinion precludes a jury finding of intent. Smith also points out there was no evidence that any of the defendants were wearing gang attire, displayed gang signs or words, or that any of the victims knew the defendants were gang members. But, as the People note, the scienter element of the gang

18

enhancement does not require that the defendant promote the *gang* during the offense; only that the defendant promote (or further or assist) *criminal conduct by gang members*.

Smith also ignores the remaining evidence. The jury learned that Smith was a member of the Rollin 30's gang, and had a tattoo of the "Hot Heads" clique of the gang whose members were "tasked" with committing residential burglaries. When Smith was arrested, he was driving a stolen vehicle. Two other occupants of the vehicle, Jarrett and Gray, were also members of the Rollin 30's gang. And the fourth occupant, Bailey, was a member of a different Crips gang, which associated with the Rollin 30's gang. There was no evidence that the occupants were unaware of each other's gang affiliation. The gang expert testified that one of the Rollin 30's primary activities was burglaries. He described how the Rollin 30's gang members committed residential burglaries, such as using stolen vehicles, working with others to have a look out, communicating by cell phone, and using a screw driver to pry open doors and windows. The description matched the manner in which the instant crimes were committed. "'[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members.'" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1171; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 ["defendant's intentional acts, when combined with his knowledge that those acts would assist crimes by fellow gang members, afforded sufficient evidence of the requisite specific intent"]; *People v. Villalobos, supra,* 145 Cal.App.4th at p. 322 [same].)

Smith relies on *In re Daniel C.* (2011) 195 Cal.App.4th 1350, but that case is distinguishable. There, in concluding the evidence was insufficient to support the specific intent element of the gang enhancement, the reviewing court noted there was no evidence that the defendant was acting in concert with his companions when he robbed a liquor store and no evidence that his companions committed or were charged with any crime. (*Id*. at pp. 1359–1364.) The same is not true here. We are satisfied that substantial evidence supports the jury's true finding on the gang allegation.

19

## V. Gang Expert's Opinion Properly Allowed

In response to a hypothetical question mirroring the facts of this case, the prosecution's gang expert testified that in his opinion the crimes in this case were committed for the benefit of, in association with, or at the direction of the Rollin 30's gang. Smith's attorney objected on the ground that this opinion went to an "ultimate fact." The trial court overruled the objection. Smith contends the trial court violated his constitutional rights by allowing such opinion testimony because it went to an ultimate issue of fact. We disagree.

"Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) In *People v. Prince* (2007) 40 Cal.4th 1179, our Supreme Court made clear that, "[d]espite the circumstance that it is the jury's duty to determine whether the prosecution has carried its burden of proof beyond a reasonable doubt, opinion testimony may encompass 'ultimate issues' within a case." (*Id*. at p. 1227.) *Prince* cited with approval *People v. Valdez* (1997) 58 Cal.App.4th 494, 507, in which the court held that it was proper for a gang expert to offer his opinion that the defendant acted for the benefit of his gang even though the opinion concerned an ultimate issue for the jury to decide. (*People v. Prince, supra*, at p. 1227.)

Smith's reliance on *People v. Killebrew* (2002) 103 Cal.App.4th 644 is misplaced. *Killebrew's* holding that a gang expert's testimony should have been excluded because it constituted an improper opinion on an ultimate issue was specifically rejected by our Supreme Court in *People v. Vang* (2011) 52 Cal.4th 1038 (*Vang*): "To the extent that *Killebrew* . . . was correct in prohibiting expert testimony regarding whether the *specific* defendants acted for a gang reason, the reason for this rule is *not* that such testimony might embrace the ultimate issue in the case. 'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.'" (*Vang, supra,* at p. 1048, fn. omitted, citing Evid. Code, § 805.) The *Vang* court explained that the reason for this rule is that opinions on guilt or innocence are simply not helpful to a jury. (*Vang*, at p. 1048.) The *Vang* court

concluded that the expert "properly could, and did, express an opinion, based on hypothetical questions that tracked the evidence, whether the assault, if the jury found it in fact occurred, would have been for a gang purpose." (*Ibid*.) "It has also long been settled that expert testimony generally, and expert testimony regarding whether a crime is gang related specifically, may be given in response to hypothetical questions." (*Id*. at pp. 1049–1050, fn. 5.)

Accordingly, the trial court properly allowed the gang expert to offer his opinion in response to a hypothetical question that the crimes were gang related.

## VI. Imposition of the Five-Year Gang Enhancement to Smith's Sentence was Error

Smith contends, and the People agree, that the trial court erred in imposing the five-year gang enhancement to Smith's sentence.

Smith was sentenced to 41 years to life in state prison, which consisted of 25 years to life in count 1 under the Three Strikes law, plus five years for the gang enhancement, plus 10 years for the two prior serious felony enhancements, plus one year for the prior prison term enhancement. The five-year gang enhancement was imposed pursuant to section 186.22, subdivision (b)(1)(B).

Section 186.22, subdivision (b)(1), provides for a sentence enhancement if a defendant is convicted of a felony committed for the benefit of, at the direction of, or in association with, any criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members. If the felony is a serious felony, the enhancement is an additional five years in state prison. (§ 186.22, subd. (b)(1)(B).)[7] However, if the defendant is convicted of a felony punishable by life imprisonment, the statute provides that the defendant must serve a minimum of 15 years before becoming eligible for parole. (§ 186.22, subd. (b)(5).) Thus, "[t]he determinate term enhancement . . . is to be applied only when the conviction is of a . . . offense for which a *determinate term* is proscribed; if the conviction is of a crime for which an *indeterminate term* of life in prison is proscribed, the limitation upon parole eligibility provided for in subdivision

---

[7] Section 186.22, subdivision (b)(1)(C) provides that if the felony is a violent felony, the enhancement is an additional 10 years.

21

(b)(5) is applicable. If the parole limitation of [section 186.22,] subdivision (b)(5) is applicable, the 10-year enhancement is not." (*People v. Fiu* (2008) 165 Cal.App.4th 360, 390; *People v. Lopez* (2005) 34 Cal.4th 1002, 1007 ["It therefore appears that the Legislature intended section 186.22[, subdivision] (b)(5) to encompass both a straight life term as well a term expressed as years to life (other than those enumerated in subdivision (b)(4)) and therefore intended to exempt those crimes from the 10-year enhancement in subdivision (b)(1)(C)"].)

Smith was convicted of a felony punishable by an indeterminate life term because it was alleged and proven that he had two prior "strikes." Accordingly, the limitation upon parole eligibility in section 186.22, subdivision (b)(5) was applicable rather than the five-year term under subdivision (b)(1)(B). Therefore, the five-year gang enhancement under section 186.22, subdivision (b)(1)(B) must be stricken and replaced with the 15-year minimum parole eligibility pursuant to section 186.22, subdivision (b)(5).

## VII. Bailey's Prior Strike Admission

Before the jury returned its verdicts, Bailey admitted that he suffered a prior juvenile adjudication for robbery on June 2, 2010, within the meaning of section 1170.12, subdivisions (a) through (d) and section 667, subdivisions (b) through (i). At sentencing, the trial court used the "strike" to double Bailey's sentence on count 2 (attempted first degree burglary) from the low term of one year to two years. Bailey contends the prior adjudication cannot be used as a "strike" because he was only 15 years old at the time of the prior offense.

Section 1170.12 provides that certain juvenile adjudications may be used to enhance a subsequent adult felony conviction if the adjudications were the result of an offense committed by a juvenile after turning 16 years old. (§ 1170.12, subd. (b)(3)(A); see also § 667, subd. (d)(3)(A) (Three Strikes law).) Bailey turned 16 in September 2008. He argues there was no factual basis to support a finding that he admitted to an adjudication for an offense he committed after turning 16 years of age.

22

### A. *Relevant Proceedings*

The information filed in this case alleged that Bailey had a prior juvenile adjudication of robbery (§ 211) on June 2, 2010, in case No. JJ15534. The following discussion later took place in court:

"[THE COURT]: How do you plead then to the prior conviction—check me to make sure I got the right numbers—in case JJ15534, a violation of Penal Code section 211 in the juvenile court on June 2nd, 2010, Los Angeles, California, within the meaning of Penal Code sections 1170.1[, subdivisions] (a) through (d), 667[, subdivisions] (b) through (i) and 667[, subdivision] (a)(1), do you admit?

"[BAILEY]: No contest.

"[BAILEY'S ATTORNEY]: No contest.

"[THE COURT]: That's an admission, right?

"[BAILEY'S ATTORNEY]: Yes.

"[THE COURT]: Thank you. [¶] Join counsel?

"[BAILEY'S ATTORNEY]: Counsel joins.

"[THE COURT]: And join in the plea and the admission?

"[BAILEY'S ATTORNEY]: So join.

"[THE COURT]: And, [the prosecutor], you also join?

"[THE PROSECUTOR]: Yes.

"[THE COURT]: I will show the defendant's freely and voluntarily, understandingly, knowingly, intelligently admitted the prior with knowledge of the consequence made long term, and there's certainly a factual basis from the probation report attached to the information in this matter." The trial court then clarified that Bailey was waiving his right to a trial on the issue of his prior adjudication.

Bailey's probation report contains two separate entries under the heading "Juvenile History." The first entry, under the date of September 18, 2007, states:

"LAPD – 211 PC (Robbery); Petition was filed on 09/20/07, Department 265, Case JJ15534; 10/11/07 in Department 265, the petition is sustained as to Count 2: 245(A)(1) PC (AWD [assault with deadly weapon]); ordered camp placement; on

23

05/07/08, released home to parent; . . . on 06/02/10, ordered camp placement; 11/05/10, placed on camp community placement released to grandmother 12/17/10."

The second entry, under the date of May 12, 2010, states:

"LAPD-211 PC (Robbery); on 05/14/10, Department 205, petition is filed; on 06/02/10, order for home on probation is terminated, petition is sustained, ordered camp placement; placed at Camp Gonzalez on 06/10/10; on 11/05/10, placed on camp community placement program for nine months; released to grandmother on 12/17/10; progress report on 2/4/11."

### B. Bailey's Admission is Supported by the Record

Bailey asserts that the probation report and information "affirmatively establishes that [Bailey] was under the age of sixteen years when he committed the robbery or assault for which he was adjudicated in juvenile case no. JJ15543." Bailey requests that we "independently review the appellate record and conclude that substantial evidence does not support the court's factual and legal determinations that the adjudication fell within the provisions of Penal Code sections 1170.12, subdivisions (a) through (d) and 667, subdivisions (b) through (i)."

The People argue that Bailey's challenge to the sufficiency of the evidence that his prior robbery adjudication constitutes a permissible "strike" is barred because he admitted the strike allegation at trial. The People rely on *People v. Lobaugh* (1987) 188 Cal.App.3d 780, in which the reviewing court found that a challenge to the evidentiary sufficiency of a firearm allegation was not cognizable on appeal in part because the defendant, who had pled guilty to a charge of robbery and had admitted the firearm allegation, had not obtained a certificate of probable cause pursuant to section 1237.5. The *Lobaugh* court stated: "Admissions of enhancements are subject to the same principles as guilty pleas. [Citation.] A guilty plea admits every element of the offense charged and is a conclusive admission of guilt. [Citations.] It waives any right to raise questions about the evidence, including its sufficiency. [Citation.]" (*People v. Lobaugh, supra,* at p. 785.)

24

Recently, our Supreme Court in *People v. Maultsby* (2012) 53 Cal.4th 296 (*Maultsby*),[8] held that a certificate of probable cause was not required to challenge an enhancement admission where the defendant was convicted of, rather than having pled to, the underlying offense. In reaching its holding, the *Maultsby* court was critical of *Lobaugh's* analysis quoted above, concluding that *Lobaugh* "incorrectly" equated an admission of an enhancement with a guilty plea, and that *Lobaugh's* "generalized conclusion" that the same principles govern an admission of an enhancement and a guilty plea was based on its "misapplication" of a prior case. (*Maultsby*, *supra,* at pp. 302–303.) The *Maultsby* court also stated that "contrary" to *Lobaugh*, whether a defendant's appellate claim challenges the validity of an enhancement admission matters only if section 1237.5 is applicable in the first place. (*Maultsby*, at pp. 302–303.)

Thus, assuming that Bailey's challenge to the evidentiary sufficiency of his admission to the prior strike remains cognizable on appeal, we conclude the record supports the finding that Bailey admitted to an offense of robbery that occurred after he turned 16 years old. Bailey's probation report states that a petition alleging a charge of robbery was filed on May 14, 2010—20 months after Bailey turned 16—and was sustained on June 10, 2010. It is true that the entry for this petition does not state a juvenile court case number. But the only case number cited, in the first entry, of JJ15534 relates to a petition in which the only count sustained while Bailey was under the age of 16 was for assault with a deadly weapon, not robbery. We are satisfied that Bailey's admission to a prior juvenile adjudication for robbery falls within sections 1170.12, subdivision (b)(3)(A) and 667, subdivision (d)(3)(A).

## VIII. The Use of Bailey's Prior Juvenile Adjudication as a "Strike" was Constitutional

Bailey contends the use of his prior juvenile adjudication as a "strike" was unconstitutional because he was not afforded a jury trial in the juvenile proceedings that resulted in the adjudication. He relies on several federal cases to support his contention,

---

[8] *Maultsby, supra,* 53 Cal.4th 296 was issued before the appellate briefs were filed but was not cited by either party.

25

including *Apprendi v. New Jersey* (2000) 530 U.S. 466. However, in *People v. Nguyen* (2009) 46 Cal.4th 1007, 1025, our Supreme Court rejected Bailey's constitutional claim, finding that *Apprendi* does not prohibit the use of juvenile adjudications to enhance a criminal penalty, even though they are not tried to a jury. As Bailey acknowledges, we are bound by the California Supreme Court's decision in *Nguyen*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)[9]

## IX. Imposition of the Prior Serious Felony Enhancement to Bailey's Sentence Under Section 667, Subdivision (a)(1) was Error

Bailey contends, and the People agree, that the trial court erred in adding a five-year prior serious felony enhancement to his sentence pursuant section 667, subdivision (a)(1) because it was improperly based on a juvenile adjudication.

Section 667, subdivision (a)(1), provides in part: "[A]ny person convicted of a serious felony who previously has been convicted of a serious felony in this state . . . . , shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately. The terms of the present offense and each enhancement shall run consecutively."

Section 667, subdivision (a)(1), applies to "prior convictions"; it does not apply to a prior juvenile adjudication. (*People v. West* (1984) 154 Cal.App.3d 100, 110 ["defendant's prior juvenile adjudications were not 'prior conviction[s]' within the meaning of Penal Code section 667, subdivision (a)"], cited with approval in *People v. Garcia* (1999) 21 Cal.4th 1, 24.) Thus, the five-year enhancement under section 667, subdivision (a)(1) must be stricken. Accordingly, we remand the matter so that the trial court has an opportunity to restructure its sentencing choices, if desired. (*People v. Edwards* (2011) 195 Cal.App.4th 1051, 1060 ["If correction of a sentencing error may affect the trial court's discretionary decisions in determining an appropriate sentence, the remedy is to reverse and remand for resentencing"]; *People v. Delgado* (2010) 181

---

[9] Bailey raises the issue "in an abundance of caution" for possible review in the federal courts.

Cal.App.4th 839, 855 [appellate court may remand for a complete resentencing after finding an error with respect to part of a sentence].)

## X. Bailey is Entitled to Additional Presentence Conduct Credit

Bailey contends, and the People agree, that Bailey is entitled to additional presentence conduct credit. The trial court awarded Bailey 269 days of presentence custody credit, based on 234 days of custody credit and 35 days of conduct credit. In calculating the conduct credit, the trial court apparently believed that Bailey's conduct credit was limited to 15 percent of his actual days in custody.

The 15 percent limitation is found in section 2933.1, subdivision (a), which provides that "any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5 shall accrue no more than 15 percent of worktime credit." Section 667.5, subdivision (c) identifies several "violent" felonies. But none of Bailey's current offenses are violent felonies listed in that section.[10]

It appears that Bailey is entitled to additional conduct credit in the amount of two days of conduct credit for every four days in actual custody. (See former § 4109, subd. (f), Stats. 2010, ch. 426, § 2, eff. Sept. 28, 2010.) Because the case is remanded to the trial court for resentencing (as discussed above), the trial court is directed to recalculate Bailey's presentence custody credit upon remand.

---

[10] Although first degree burglary with a person present in the residence is a identified violent felony in section 667.5, subdivision (c)(21), Bailey was convicted of *attempted* first degree burglary.

27

**DISPOSITION**

The five-year prior serious felony enhancement under section 667, subdivision (a)(1), is stricken from Bailey's sentence and the matter is remanded for resentencing of Bailey. Upon remand, the trial court is directed to recalculate Bailey's presentence custody credit. In addition, the five-year gang enhancement added to Smith's sentence under section 186.22, subdivision (b)(1)(B), is stricken and replaced with the 15-year minimum parole eligibility pursuant to section 186.22, subdivision (b)(5). In all other respects, the judgments of conviction are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
BOREN

_____, J.[*]
FERNS

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.